

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | No. 08-23-00282-CV |
|---|---|---|
| IN THE INTEREST OF: | § | Appeal from the |
| Z.E.C. and E.K.M., a/k/a E.C.M., | § | 112th Judicial District Court |
| CHILDREN. | § | of Crockett County, Texas |
| | § | (TC# 22-09-08226-CV) |

## MEMORANDUM OPINION

Appellant Z.C. appeals the trial court's judgment terminating her parental rights and appointing the Department of Family and Protective Services (the Department) as sole managing conservator of children, Z.E.C. and E.K.M.[1] The trial court terminated Z.C.'s parental rights on the predicate grounds of child endangerment and failure to comply with a family service plan; and further determined that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (O), and (b)(2). In eight issues, Z.C. challenges the legal and factual sufficiency of the evidence to support the predicate grounds for termination, and the findings about

---

[1] To protect the privacy of the parties, we refer to them by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(a), (b)(2). As for E.K.M., we note he is occasionally referred to as E.C.M. throughout the record of this appeal.

the children's best interest and the Department's reasonable efforts to return the children to their parent before commencing a trial on the merits. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Z.C. is the mother of Z.E.C. and E.K.M., two toddler boys, three and one respectively, at the time of trial. A.S. is the alleged father of both boys.[2]

### A. The initial investigation[3]

On September 5, 2022, the Department received a referral reporting concerns of neglectful supervision of two children by parents, Z.C. and A.S. The investigation revealed Z.C. had tested positive for methamphetamine at the birth of E.K.M., her third child. The Department had prior involvement with Z.C. due to a history of substance abuse. And twice before, Z.C. tested positive when giving birth.

At the hospital, when a caseworker first met with Z.C., she initially denied she had most recently used illicit drugs. But during the conversation, she acknowledged her use of methamphetamine a month prior, and again a few days before giving birth. Eventually, she admitted she had been using daily while at home, but she denied that Z.E.C., her three year old, was also present. She explained her mother picked up Z.E.C. daily for a couple of hours and she used methamphetamine while he was out of the home. Also, she said that A.S. had used drugs with her. Upon discharge from the hospital, Z.C. planned to return home where she lived with A.S. and

---

[2] At the start of the final hearing, the trial court terminated A.S.'s parental rights based on his waiver of his rights.

[3] During the final hearing, the trial court took judicial notice of its previous rulings including temporary orders following the adversary hearing. Although a trial court may take judicial notice of its records, it may not take such notice of the truth of factual statements and allegations made therein. *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Here, the Department's original petition attached an affidavit in support of the removal of the two children subject of this suit. We refer to the affidavit in this decision but only to the extent it provides context and improves our understanding of the factual background.

Z.E.C. She briefly mentioned she had a friend who was interested in adopting her newborn child, but no paperwork or formal process had yet begun. Z.C. reported she had previously attended a drug class, but she still continued to use methamphetamine. The nursing staff observed track marks on Z.C.'s arms.

Detailing Z.C.'s prior CPS history, the investigator noted that Z.C. tested positive for marijuana use at the birth of Z.E.C. in 2020. Thereafter, in July 2021, Z.C. tested positive for methamphetamine and marijuana when her second child was born, a daughter who is not a subject of this suit. Furthermore, in September 2021, Z.C.'s daughter was found alone in an apartment and the Department found reason to believe that Z.C. and her mother neglectfully supervised the child. In October 2021, the daughter presented to the emergency room with seizure like activity and tested positive for methamphetamine. Z.C. and her mother admitted to their use of methamphetamine and the Department found reason to believe Z.E.C. and her daughter were exposed to methamphetamine. The case was closed in May 2022 after Z.C.'s daughter was placed with the child's aunt.

Following the intake of the case, the Department was concerned that Z.C.'s and A.S.'s use of drugs in their home placed Z.E.C. and E.K.M. at risk of harm from drug exposure. Due to the children's vulnerable ages and their inability to self-protect, the Department believed there was an immediate danger to the physical health or safety of Z.C.'s two children. The caseworker initiated the removal process and placed Z.E.C. and E.K.M. with the same aunt who was caring for Z.C.'s daughter.

## B. The procedural background

On September 9, 2022, the Department filed its original petition after taking emergency possession of the children. That same day, the trial court entered an order for protection naming

3

the Department temporary sole managing conservator of the children. Following an adversary hearing, the trial court appointed the Department temporary managing conservator and designated Z.C. as possessory conservator.

The trial court ordered Z.C. to participate in services by working with a caseworker to develop her service plan. Upon her signing of the plan, the Department was ordered to provide her with a copy of the plan. The service plan was later adopted and made an order of the court.

## C. The final hearing

A bench trial was held on October 5, 2023, wherein the Department sought to terminate the parental rights of A.S. and Z.C., as to both of the children subjects of this suit. A.S. voluntarily waived his parental rights, while the Department presented the following evidence in support of the termination of Z.C.'s parental rights.

### (1) The caseworker's testimony

Heather Chagola, a caseworker for the Department and a custodian of its records, testified she became personally involved in the case in November 2022. Chagola's testimony focused largely on the Department's concerns about Z.C.'s methamphetamine usage, her exposure to domestic violence, and her compliance with the trial court's ordered service plan.

Chagola testified that, after the adversary hearing of September 2022, the trial court ordered the Department to provide services to Z.C. that could lead to her reunification with her children. Z.C. was ordered to comply with the service plan. Chagola reported that Z.C. had not fully complied with services. She believed Z.C. initially worked well with the caseworker assigned. But over time, the caseworker could not reach Z.C., and she did not contact the Department. Chagola documented that Z.C. did not resume services until around April 2023. In sum, she described that

4

Z.C. had participated "on and off with all of her services," and failed to complete several ordered by the court.

For example, Chagola testified that Z.C. was ordered to submit to monthly drug testing. But Z.C. only tested three or four times while missing multiple tests. When tested on three occasions, Z.C. tested negative. Chagola explained, however, the multiple missed tests were automatically deemed positive per the Department's policy. As for substance abuse treatment, Z.C. voluntarily enrolled herself into a rehab facility but she left after two weeks, before completing the program. As for Z.C.'s drug usage, Chagola testified the children's physical or emotional welfare was endangered when illicit drugs were taken while she was caretaking a child. She described that drug usage infringed on a parent's ability to maintain responsibility. Based on Z.C.'s failure to consistently test negative for drug use, the Department felt she had not addressed or alleviated the concerns about her usage.

Chagola also testified the Department had concerns about domestic violence between Z.C. and A.S. The caseworker noted Z.C. had unexplained bruises on her face and her body at the start of the case. When questioned about her bruises, Z.C. noticeably looked to A.S. before she answered. In February 2023, there was a reported incident of domestic violence involving Z.C., A.S., and Z.C.'s mother. Chagola testified that Z.C. denied the incident at first, but later confirmed it. Chagola confirmed that Z.C. had completed eight domestic violence classes. Nonetheless, Chagola expressed that she believed the domestic violence in the home had negatively impacted Z.E.C., the older of the two children. Specifically, she received reports that Z.E.C. was showing signs of aggression. Due to this behavior, there were times when Z.E.C. was not allowed to remain at daycare. Chagola described that Z.E.C. appeared to act aggressively only with women. She

noted he "straightens up" around his foster father. Chagola reported that Z.E.C. was currently on a waiting list to receive therapy.

The service plan also required that Z.C. obtain appropriate housing, provide proof of residence, allow for announced and unannounced home visits, and report names and phone numbers of any person over the age of 14 who resided in the home. Chagola testified that, when the case began, Z.C. lived with A.S. and his mother. By the time of trial, she understood that Z.C. lived in Lubbock with her sister. Although Chagola suspected that Z.C. moved frequently, having lived in at least six different locations during the course of the case, not much information was known about many of her previous addresses. Also, Z.C. had failed to provide her current address. Chagola testified the Department could not determine whether Z.C. could provide a safe and stable home for her children because she frequently moved without providing her change of address. As for her employment, Chagola was only able to verify that Z.C. worked for a retail business for about a month. Z.C. informed the Department that she had also previously worked for a hotel chain, and she currently cleaned houses. Chagola testified, however, that she was not able to confirm those claims.

Chagola also testified about Z.C.'s visitation with her children. As of March of 2023, Z.C. attended seven visits and missed five. Chagola noted her absences had become so frequent that the Department asked her to confirm her attendance both 24-hours and 2-hours in advance. When visits were held, Chagola observed Z.C.'s interactions with Z.E.C. and E.K.M. She believed that Z.C. favored Z.E.C. and paid little attention to E.K.M, who was not yet a year old. Chagola acknowledged that Z.C. would regularly ask about how the children had been for the "past two, three months." But she did not keep up with their medical needs and did not ask to attend doctor's appointments. Chagola was not aware of whether Z.E.C., who had by then turned three years of

age, had expressed a desire to live with Z.C. Chagola confirmed that Z.C. completed parenting classes as ordered.

Finally, Chagola noted the Department offered Z.C. transportation to help her attend visits with her children and to submit to drug testing. She also mentioned that Z.C. was provided with a copy of her service plan on at least three separate occasions. Overall, Chagola reported, it had been difficult throughout the case for the Department to contact Z.C., and she failed to respond to messages and calls.

(2) Z.C.'s testimony

Z.C. responded briefly to the caseworker's testimony. Her direct examination resulting from questioning by the Department's counsel spans only three pages of the reporter's record. First, she addressed the caseworker's claim that she had failed to return messages. She commented, "[j]ust as much as when I tried to get a hold of her, she's not getting in contact with me." Then, at one of the visits, she and the caseworker had confirmed numbers only to learn that the Department had the wrong number for reaching her. At that point, Z.C. provided a new number to her caseworker. Second, on a new topic, counsel asked if she denied that she was currently pregnant. She answered, "Yes." At that point, no further questions were asked.

On cross-examination by her own counsel, Z.C. testified that A.S. had physically abused her and acted controlling during their relationship. She further confirmed they both were using drugs "at some point," and A.S. dealt drugs for money. When Z.C. voluntarily left a treatment facility, A.S. had picked her up. At that point, she described that A.S.'s violence against her continued, though not as much as before. She credited the change to his drug dealing paying well. She confirmed that she and A.S. were no longer together and there existed no chance of them getting back together.

7

Z.C. also responded to other parts of the caseworker's testimony. First, she refuted the caseworker's claim that she favored one child over the other. She testified she loved both of her children. Second, on her compliance with the service plan, she described that she had been trying to work the services. To date, she completed parenting classes and others addressing abuse. From the beginning of her involvement with the Department, she added that she has been attending counseling and relying on supportive programs such as narcotics anonymous and alcoholics anonymous.

As for her current residence, Z.C. testified she lives in an apartment in Midland with A.S.'s father. She claimed he was trying to help her get her kids back. She described that A.S.'s father maintained a positive relationship with A.S. She confirmed she currently did not have a job, but she was actively seeking employment. Her testimony under cross-examination ended after a mere 11 pages of the reporter's record.

### (3) CASA recommendation

The court-appointed special advocate (CASA) recommended termination because there was "no consistent improvement in services, specifically housing and employment." CASA further recommended the Department be named managing conservator of the children.

### (4) Trial court's judgment

At the end of the trial, the trial court found there was clear and convincing evidence that Z.C. failed to comply with the service plan and she previously placed the children in an environment that was knowingly dangerous to the children. The trial court further found termination of parental rights was in the children's best interest. The trial court later entered a written order terminating Z.C.'s parental rights based on TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D) and (O). Z.C. brought this appeal.

## STANDARD OF REVIEW AND APPLICABLE LAW

The involuntary termination of a parent's rights to their child is an issue of constitutional dimension deserving of a heightened burden of proof. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.T.G.*, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.). As such, the quantum of proof required in termination cases rises from preponderance of the evidence to clear and convincing evidence. *In re J.T.G.*, 121 S.W.3d at 124. Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

When the legal sufficiency of the evidence is challenged, reviewing courts consider all the evidence in the light most favorable to the required finding to "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We defer to the fact-finder's conclusions, indulge every reasonable inference supporting the finding, and presume the fact-finder resolved any disputed facts in favor of the findings. *Interest of L.D.C.*, 622 S.W.3d 63, 69 (Tex. App.—El Paso 2020, no pet.). While we may not disregard undisputed facts, we disregard any evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *Id.*

Likewise, in reviewing the trial court's findings for factual sufficiency, the reviewing court looks to whether the evidence is such that the fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Importantly, we must not substitute our judgment for that of the fact-finder. *Interest of D.R.V.*, No. 08-22-00238-CV, 2023 WL 2544577, at *5 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.). We must give due consideration to evidence that the fact-finder reasonably could have

9

found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We also "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* The evidence is factually insufficient when, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction. *Id.*

Section 161.001 of the Texas Family Code states that a court may order the termination of a parent–child relationship provided it finds clear and convincing evidence that (1) at least one of the grounds for termination enumerated in § 161.001(b)(1) is proved, and (2) termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b). In turn, § 161.001(b)(1) lists 22 grounds for terminating the parent–child relationship, each of which is sufficient alone to justify termination. *Id.*; *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating only one predicate finding under § 161.001 is necessary to support termination). Reviewing courts are always required to review a trial court's findings under subsections (D) and (E), whenever those grounds are implicated, because affirmative findings under those grounds have collateral consequences with respect to the parent's rights to future children. *Interest of N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019).

## SECTION (D): ENDANGERING ENVIRONMENT

In her first and second issues, Z.C. asserts there was legally and factually insufficient evidence to support the trial court's finding of endangerment under subsection (D).

Termination under subsection (D) requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE ANN.

10

§ 161.001(b)(1)(D). "Endanger" as used by the statute means "to expose [the child] to loss or injury; to jeopardize." *Interest of J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (quoting *Texas Dep't of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Although "endanger" means more than "a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it does not require that the conduct be directed at the child or that the child actually suffer injury. *Id.* The relevant time frame for evaluating this ground is "before the child's removal since conditions or surroundings cannot endanger a child unless that child is exposed to them." *Id.* (internal quotation marks omitted).

Initially, the children were removed from Z.C. because she tested positive for methamphetamine upon E.K.M.'s birth. Z.C. admitted to using drugs in the past, and even though she voluntarily entered a rehabilitation program, she left the facility early to return to A.S. who was earning income dealing drugs. During the pendency of the case, Z.C. failed to comply with mandatory drug testing at least on a monthly basis. Although she tested negative on three tests, the multiple remaining tests were considered positive because of her failure to submit to testing. Though the caseworker testified that Z.C. had been inconsistent with her compliance with the service plan, Z.C. pointed out she currently received counseling through A.A. and N.A.

In her brief testimony, Z.C. neither declared that she no longer used drugs nor indicated when it was that she had last used. A parent's illegal drug use may support a finding of environmental endangerment. *See Interest of A.H.*, 679 S.W.3d 817, 829 (Tex. App.—El Paso 2023, pet. denied) (mem. op.). Additionally, a parent's failure to submit to court-ordered drug tests can be taken as an indication that the parent was avoiding testing because of illicit drug use. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Also, a parent's continued drug use when the custody of her children is in jeopardy supports a finding of

11

endangerment. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Based on the totality of the evidence, we conclude the trial court could have reasonably believed that Z.C. would continually place the children in a situation that would endanger their safety and well-being.

The trial court also considered evidence of domestic abuse in Z.C.'s relationship. Caseworker Chagola noted a prior caseworker had viewed bruises on Z.C. and learned of a domestic violence incident in the past. Although no specific evidence of domestic violence between Z.C. and A.S. was introduced by the Department, Z.C. conceded that A.S. had been violent towards her and controlling during their relationship. Thus, there was no dispute that her relationship with him had been abusive, yet she voluntarily left the rehabilitation facility to return to him while he dealt drugs. Although Z.C. testified they were no longer together, the trial court could have disbelieved her testimony based on her repeated pattern of returning to A.S. There was evidence that A.S. was always with Z.C. at visits and court hearings. The trial court also heard from Z.C. that she was currently living with A.S.'s father who in turn maintained his relationship with A.S. "Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child." *Interest of G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.) (citing *Boyd*, 727 S.W.2d at 533). Based on this evidence, the trial court could have reasonably believed that Z.C. would continually place the children in a situation that would endanger their safety and well-being. *See Interest of G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.) (holding a parent's decision to continue living with someone who has caused instances of domestic violence may support an endangerment finding under subsection (D)); *see C.H. v. Texas Dep't of Family & Protective Services*, 389 S.W.3d 534,

540 (Tex. App.—El Paso 2012, no pet.) (holding that a parent's inappropriate, abusive, or unlawful conduct may create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)).

Viewing this evidence in a light most favorable to the trial court's finding, as we must, we hold the evidence is legally and factually sufficient to support the trial court's finding that Z.C. knowingly placed Z.E.C. and E.K.M. in an environment that endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *Interest of A.H.*, 679 S.W.3d at 829; *Interest of R.A.B.*, No. 08-22-00247-CV, 2023 WL 3672050, at *7 (Tex. App.—El Paso May 25, 2023, pet. denied) (mem. op.). We overrule the first and second issues.

Having determined the trial court's predicate findings under subsection (D) was grounded in legally and factually sufficient evidence, we decline to address Z.C.'s third and fourth issues relating to subsection (O), as it is unnecessary to the resolution of the appeal. TEX. R. APP. P. 47.1.

## BEST INTEREST OF THE CHILD

In her fifth and sixth issues, Z.C. contends the evidence was legally and factually insufficient to establish that termination was in the best interest of the children. The involuntary termination of parental rights must also be supported by legally and factually sufficient evidence that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *Interest of G.C.S.*, 657 S.W.3d 114, 133 (Tex. App.—El Paso 2022, pet. denied). "A strong but rebuttable presumption exists that it is in the child's best interest to preserve the parent-child relationship." *Interest of A.H.*, 679 S.W.3d at 831. The child's best interest is analyzed under the *Holley* factors:

(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking

13

custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (internal citations omitted). While no single factor is controlling, in some factual situations, evidence may weigh in favor of termination based on a single *Holley* factor. *See Interest of A.H.*, 679 S.W.3d at 831.

### A. The children's desires

"When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *Interest of A.H.*, 679 S.W.3d at 831–32 (quoting *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). Here, Z.E.C. and E.K.M. were three years old and one year old, respectively, and there was no evidence of their expressed desires. Moreover, there was no evidence presented of whether the children had bonded with the foster family. Caseworker Chagola did testify the current placement at the foster home was not a permanent placement.

There was evidence that, since March 7, 2023, Z.C. attended seven visits with her children and missed five. Chagola testified that Z.C.'s visits were inconsistent to the point that she was asked to call in advance of visits to confirm her attendance. Without objection, Chagola testified that Z.C. had "a very small bond" with Z.E.C. and had no bond with E.K.M.

Based on this evidence, the trial court could have found termination weighed in favor of a best interest finding because Z.C. spent minimal time with the children and did not nurture or maintain a strong bond through visitation. *See Interest of O.E.R.*, 573 S.W.3d 896, 907

14

(Tex. App.—El Paso 2019, no pet.) (stating that evidence that child has spent minimal time with parent bears on the first *Holley* factor).

**B. The emotional and physical needs of the children and their exposure to emotional and physical danger**

We consider each child's needs individually. There was no evidence presented regarding E.K.M.'s emotional or physical needs. As to Z.E.C., there was evidence he had begun to show aggression and the Department had placed him on a waiting list for therapy.

In terms of physical and emotional danger to the children, "a fact finder may infer [the] past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *Interest of O.E.R.*, 573 S.W.3d at 907. As discussed when analyzing the predicate finding under subsection (D), there is evidence of record of endangering conduct and dangerous environment. In addition to Z.C. testing positive for drugs at each child's birth, there was also evidence that she continued to test positive for drug use throughout the pendency of the case. Importantly, Z.C. did this knowing it could result in termination of her parental rights. This Court has noted that methamphetamine is a Penalty Group 1 narcotic and is a "hard drug," which carries a greater risk of danger and incarceration. *See Interest of R.A.B.*, 2023 WL 3672050, at *11 (citing TEX. HEALTH & SAFETY CODE ANN. § 481.102(6)). Moreover, there was evidence that Z.C. continued to associate with A.S., who previously abused her, and he was a drug dealer while she lived with him.

Based on the totality of this evidence, the trial court could have determined that Z.C. would continue to expose the children to emotional and physical danger. These factors all weigh in favor of supporting the trial court's best interest finding.

15

### C. Parenting abilities and programs available to assist

When reviewing parenting abilities, a fact-finder may consider the parent's past neglect or inability to meet the physical and emotional needs of the children. *Interest of O.E.R.*, 573 S.W.3d at 907–08. Although Z.C. continued to be involved with the children during the pendency of the case by attending visitation and taking some classes, her failure to submit herself to drug tests and complete other required services could lead a reasonable trier of fact to conclude she had poor parenting abilities.

In considering the best interest of the child in termination proceedings, the trial court may consider that the parent failed to comply with the court ordered service plan for reunification of the child. *Interest of G.C.S.*, 657 S.W.3d at 135. Although Z.C. testified she completed classes, she provided no records to the Department knowing they were part of her plan. Z.C.'s failure could lead a reasonable trier of fact to conclude she was unwilling to take advantage of services offered and further doubt her parenting abilities. This weighs in favor of the best interest finding.

### D. Plans for the children and the stability of the proposed placement

Z.C. did not testify as to any plans for the children. The evidence did show she failed to maintain housing and employment stability throughout the case. The Department was unable to assess the propriety of Z.C.'s current living space because Z.C. failed to keep the Department apprised of her residence. Z.C. also had about three different jobs throughout the case, but the Department was only able to verify one—a retail job lasting a month—while she did not provide proof for her other claimed jobs. Z.C. admitted she was currently not working and did not have a vehicle.

The Department did not provide evidence of any specific plans for the children. There was evidence that the current foster home was not the intended permanent placement for the children.

Additionally, Chagola testified that the Department planned to pursue adoption for Z.E.C. and E.K.M. The Department's records do show the intention to keep the children together. However, the proper inquiry is "whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest— even if the agency is unable to identify with precision the child's future home environment." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Therefore, the lack of a firm permanency plan does not weigh against the best interest finding. A reasonable trier of fact could conclude that the Department's plans and stability for the children supported termination. These factors weigh in favor of the best interest finding.

Viewing the evidence in the light most favorable to the finding, the trial court could reasonably have formed a firm belief or conviction that the termination of Z.C.'s parental rights was in the children's best interest. Accordingly, the finding was supported by legally and factually sufficient evidence. We overrule Z.C.'s fifth and sixth issues.

## REASONABLE EFFORTS TO RETURN THE CHILDREN

In her seventh and eighth issue, Z.C. asserts there was legally and factually insufficient evidence to establish by clear and convincing evidence that the Department complied with § 161.001(f) and (g). The two sections provide:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
>> (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; or

17

(2) reasonable efforts to return the child to the parent, including the requirement for the department to provide a family service plan to the parent, have been waived under Section 262.2015.

(g) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services in which the department made reasonable efforts to return the child to the child's home but a continuing danger in the home prevented the child's return, the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home.

TEX. FAM. CODE ANN. § 161.001(f), (g).

The legislature recently amended § 161.001 to include additional requirements for trial courts in termination suits filed by the Department and a new ground for termination that relates to convictions for solicitation of a minor; however, these amendments only apply to suits filed on or after September 1, 2023. Act effective date September 1, 2023, 88th Leg., R.S., ch. 728, § 1, 2023 Tex. Sess. Law Serv. 1770, 1772 (codified at TEX. FAM. CODE ANN. § 161.001(b)(1)(V)); Act effective date September 1, 2023, 88th Leg., R.S., ch. 675, § 1, 2023 Tex. Sess. Law. Serv. 1646, 1646 (codified at TEX. FAM. CODE ANN. § 161.001(f), (g)). The original petition to terminate the parent-child relationship in this case was filed prior to September 1, 2023. We therefore apply the law in effect on the date the suit was filed.

Accordingly, we overrule Z.C.'s seventh and eighth issues.

## CONCLUSION

We affirm the order terminating Z.C.'s parental rights to Z.E.C. and E.K.M.

GINA M. PALAFOX, Justice

February 26, 2024

Before Alley, C.J., Palafox and Soto, JJ.

18